**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                 )
**THE DO CORPORATION** and     )
**DANIEL SILVA,**                 )
                                 )
       **Plaintiff,**            )
                                 )
       **v.**                     )     **Civil Action No. 13-11726-DJC**
                                 )
**TOWN OF STOUGHTON et al.,**   )
                                 )
       **Defendant.**           )
                                 )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                     **December 6, 2013**

## I.    Introduction

Plaintiffs The Do Corporation ("TDC") and its President, Daniel Silva (collectively "Plaintiffs"), have sued the Town of Stoughton (the "Town"); its Board of Selectmen, John M. Anzivino, Cynthia A. Walsh, Stephen G. Anastasia, Robert J. O'Regan and Thomas J. Recupero; its Police Chief, Paul J. Shastany; and Town Manager, Michael Hartman (collectively "Defendants"). Plaintiffs allege that by revoking TDC's entertainment license and modifying its liquor license, Defendants deprived TDC and Silva of their rights to freedom of speech, freedom of association and equal protection under the First and Fourteenth Amendments to the United States Constitution. D. 1-2. Plaintiffs have also asserted claims under various provisions of Massachusetts statutory law as well as the Massachusetts Declaration of Rights. Id. TDC and Silva have moved for a preliminary injunction "restraining the Board of Selectmen from enforcing an order revoking Plaintiffs' entertainment license and modifying Plaintiff's liquor license." D. 8 at 1. TDC and Silva also seek expedited discovery. D. 8-2. In addition, one of

the Defendants Paul J. Shastany ("Shastany"), has moved to dismiss the complaint arguing that it fails to state a claim against him.  D. 9.  For the reasons stated below, the Court DENIES Plaintiffs' motion for a preliminary injunction and request for expedited discovery and ALLOWS IN PART Shastany's motion to dismiss.

## II.     Standard of Review

### A.     <u>Preliminary Injunction</u>

To obtain a preliminary injunction, the party seeking the injunction must demonstrate: "1) a substantial likelihood of success on the merits; 2) a significant risk of irreparable harm if the injunction is withheld; 3) a favorable balance of hardships and 4) a fit, or lack of friction, between the injunction and the public interest."  <u>Nieves-Marquez v. Puerto Rico</u>, 353 F.3d 108, 120 (1st Cir. 2003).  A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008) (citing <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997)); <u>see also</u> <u>Voice of the Arab World v. MDTV Med. News Now, Inc.</u>, 645 F.3d 26, 32 (1st Cir. 2011) (labeling a preliminary injunction as an "extraordinary and drastic remedy") (quoting <u>Munaf v. Geren</u>, 553 U.S. 674, 689-90 (2008)).

### B.     <u>Motion to Dismiss</u>

In considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court will dismiss a complaint or a claim that fails to plead "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  To state a plausible claim, a complaint need not contain detailed factual allegations, but it must recite facts sufficient to at least "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." Id. at 555. "In determining whether a complaint crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'" García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). "This context-specific inquiry does not demand 'a high degree of factual specificity.' Even so, the complaint 'must contain more than a rote recital of the elements of a cause of action.'" García-Catalán, 734 F.3d at 103 (internal citations omitted).

## III.   Background

### A.   Factual Background

The Court summarizes the following facts in consideration of the pending motions, but notes that in deciding the motion to dismiss, the Court only considers factual allegations in the complaint. For the purposes of deciding Shastany's motion to dismiss, the Court assumes that the factual allegations in the complaint are true. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

TDC operates Whiplash, a nightclub located at 63 Wyman Street, Stoughton, which specializes in playing hip-hop, rap and reggae music. Compl., D. 1-2, ¶¶ 12-13; Affidavit of Daniel Silva, D. 8-6 ¶¶ 4, 6. Most of the Whiplash's clientele are either African-American or Hispanic. Compl. ¶ 14; D. 8-6 ¶ 7. As of April 21, 2013, Whiplash held a valid license to serve alcoholic beverages and a valid entertainment license. Id. at ¶ 8; Compl. ¶ 15. Prior to that date, Whiplash had not been subject to any enforcement action relating to either license. Id. ¶ 16; D. 8-6 ¶ 9.

Stoughton officials, however, have reported a number of incidents occurring at or around Whiplash since 2012. Specifically, Defendant Stoughton Police Chief Paul Shastany reports that (1) on July 1, 2012, the Boston Police executed an arrest warrant of a suspected gang member at

Whiplash; (2) on July 14, 2012, Stoughton Police arrested a patron for disorderly conduct and indecent assault and battery; (3) on September 16, 2012, Stoughton Police arrested a patron for disturbing the peace; (4) on September 30, 2012, Stoughton Police noted that Whiplash had violated the Stoughton Fire Code by admitting 235 patrons despite the club's maximum occupancy of 166; (5) on October 29, 2012, Stoughton police investigated an attempted arson at Whiplash; (6) on November 11, 2012, Stoughton Police issued a criminal summons to a juvenile for assault and battery and malicious destruction of property at Whiplash; (7) on March 24, 2013, Stoughton Police arrested a patron who ran over the legs of another patron with a motor vehicle; and (8) on April 20, 2013, Stoughton Police placed an intoxicated Whiplash patron in protective custody.  Affidavit of Paul J. Shastany, D. 13-1 ¶ 9.  As a result of these incidents, Shastany "determined it was necessary to direct the entire shift of police officers on duty at closing time" to report to Whiplash "to facilitate the peaceful dispersal of patrons."  Id. ¶¶ 11-12.  In testimony on May 8, 2013, Stoughton Police Officer John Bonney concurred that "in the last two months . . . or two and a half months . . . it's probably happened six or seven times that we've used our whole staff to shut down [Whiplash]."  D. 13-2 at 12.

According to Shastany, on April 14, 2013, Stoughton police officers were dispatched to disperse a fight inside the club.  D. 13-1 ¶ 9.  Upon entry, a patron of the nightclub punched an officer and attempted to seize his service weapon.  Id.  A fight ensued outside the establishment where approximately 200-300 patrons had gathered, preventing the officer from arresting the patron who had assaulted him.  Id.  The large gathering also required the Stoughton police to seek assistance from the Randolph and Canton police departments as well as the Massachusetts State Police ("MSP").  D. 13-2 at 5.  The April 14th incident resulted in six arrests, including the arrest of a 16-year-old patron.  D. 13-1 ¶ 9.  Officer Bonney, who was at the scene, reported that

without the assistance of an MSP canine unit and local police from Randolph and Canton, officers would have been unable to effect a complete dispersal of the crowd. D. 13-2 at 9. Bonney further reported that, in his view, Whiplash's management did not have control over the situation. Id. at 10. The April 14th event was of particular concern to the Stoughton Police Department because a patron of the nightclub had attempted to disarm an officer. Id. at 20.

The escalation of unlawful conduct at Whiplash culminated on or about April 21, 2013, when a detail of the Stoughton Police Department again responded to assist with the orderly dispersal of crowds. Compl. ¶ 17; D. 8-6 ¶ 10. At this time, one of the police officers heard gunshots coming from a MBTA parking lot roughly 300 feet from Whiplash and two of the officers discovered that an individual had suffered gunshot wounds. Compl. ¶¶ 18-19. Although the shooting occurred in the MBTA parking lot, this lot served as overflow parking for the club given the limited number of parking spots at Whiplash. D. 13-2 at 32. Silva has not disputed that the shooting likely involved Whiplash patrons. Id. At oral argument, counsel for Shastany stated that the victim of the shooting was a teenager who had been at the nightclub earlier in the evening. Stoughton Police Officer Matthew Farwell later testified at the Town's hearing that there were also several fights inside the nightclub. D. 13-2 at 15. Farwell described the atmosphere inside Whiplash as "literally chaos." Id. at 17.

After the April 21st incident, Shastany sent a letter to the Town's Board of Selectmen (the "Board") asking the Board to revoke Whiplash's entertainment license and suspend its liquor license. D. 8-6 ¶ 13; D. 6 at 16. In his letter, Shastany noted that Whiplash has "started to attract a younger urban clientele," "continues to constitute a serious threat to the safety of the public and Police Officers," "is attracting known criminal gangs from Boston" and "is incapable of satisfactorily complying with [police] efforts to eliminate that [criminal gang] element from

the club."  Id.  Shastany was concerned that Whiplash has monopolized police resources since

the department's "midnight shift is routinely needed to assist when closing forces groups out into

the [parking] lots.  It is unreasonable [sic] routinely tie up the entire midnight shift trying to

disperse unruly and sometimes violent people.  The groups have little regard for the presence of

uniformed Police Officers as we saw Saturday when shooting erupted in their presence."  Id. at

17.

On May 8, 2013, the Board conducted a hearing regarding Whiplash's licenses.  Compl. ¶

22; D. 8-6 ¶ 15.  Shastany testified that "the business is attracting gangs to this area . . . between

social networking, Hip Hop music, style of entertainment and DJ's with followers, the lifestyles

that we are seeing come with violence.  Most of these people that go to Whiplash come from out

of town, Boston, Brockton, out of towners."  Compl. ¶ 26; D. 8-6 ¶ 19.  After the hearing, the

Board unanimously voted to revoke Whiplash's entertainment license, suspend the liquor license

for 30 days and modify the alcoholic beverage license to require Whiplash to stop serving

patrons at 11 p.m.  Compl. ¶ 27; D. 8-6 ¶ 20.

Silva appealed the Board's decision to suspend Whiplash's liquor license to the

Massachusetts Alcohol Beverage Control Commission ("ABCC").  D. 8-6 ¶ 27.  The ABCC held

a hearing in late June 2013.[1]  Id. ¶ 28.  The ABCC reversed the Town's decision, finding that the

Town failed to state which statute TDC violated.  Id. ¶ 29.  Silva alleges that as a result of the

Board's decision, Whiplash cancelled future events, causing the nightclub a significant loss in

revenue and making it difficult to service the mortgage on the property where Whiplash is

located.  Id.  Although Whiplash faces foreclosure, it represents that the current holders of the

---

[1] Silva's affidavit states that the ABCC held its hearing on June "31," 2013, D. 8-6 ¶ 28,
but the Court assumes that the hearing occurred on some day in late June 2013.

mortgage have agreed to stay foreclosure proceedings if the Court issues an injunction.  Id. ¶¶ 34-35.

### B.    Procedural History

Plaintiffs commenced this action in Norfolk Superior Court on July 12, 2013.  D. 6. Counts I-III allege deprivations of Plaintiffs' First and Fourteenth Amendment rights; Counts IV-VI allege violations of the Massachusetts Civil Rights Act; Counts VII-IX allege violations of the Massachusetts Declaration of Rights; Count X alleges a violation of Mass. Gen. L. c. 138; Count XI alleges a violation of Mass. Gen. L. c. 140; Count XII alleges a violation of Mass. Gen. L. c. 272, § 98; and Count XIII seeks a declaratory judgment that the defendants denied Plaintiffs equal treatment in a place of public accommodation.  Id.  Defendants removed this action to this Court on July 17, 2013.  D. 1.  Plaintiffs have now moved for a preliminary injunction.  D. 8. Plaintiffs have also moved for expedited discovery.  D. 8-2.  Shastany has opposed both motions, D. 12-13, and the remaining defendants joined Shastany's opposition on August 13, 2013.  D. 17.   Shastany has also moved to dismiss the claims against him.  D. 9.   The Court has now heard argument on the pending motions and took the matters under advisement.  D. 23.

## IV.    Discussion

### A.    Silva Has At Least Constitutional Standing

As an initial matter, Defendants challenge the standing of co-Plaintiff Silva to bring his claims in this lawsuit.  D. 13 at 11; D. 10 at 8.  In the complaint, Plaintiffs allege that TDC is incorporated under Massachusetts law and operates as Whiplash and Silvia is the president of TDC.  Compl.  ¶¶ 1-2, 12.  Defendants assert that Silva lacks standing to bring the claims asserted in this case because Whiplash is operated by TDC, rather than Silva.  D. 13 at 11; D. 10 at 8.  Similarly, Defendants argue that the Town revoked the licenses at issue from Whiplash and

not from Silva, invoking the so-called "shareholder standing rule." Id.  "[W]hen the defendants'
alleged wrong violates a right belonging to a corporation, or causes an injury to a corporation, a
shareholder cannot, in his own name, bring an action to enforce those rights or redress those
injuries." Laverty v. Massad, 661 F. Supp. 2d 55, 62 (D. Mass. 2009) (citing Diva's Inc. v. City
of Bangor, 411 F.3d 30, 42 (1st Cir. 2005) (applying this standing requirement to "actions
brought to redress injuries to a corporation under Section 1983)).  "This standing rule applies
even when there is only one shareholder in a corporation [and] applies to actions to redress
injuries to a corporation under § 1983." Diva's, 411 F.3d at 42; see also Schaeffer v. Cohen,
Rosenthal, Price, Mirkin, Jennings & Berg, P. C., 405 Mass. 506, 514  (1989) (affirming under
Massachusetts state law that the co-owner of a closely held corporation "lacked standing to . . .
recover for losses that the judge found were sustained by [the corporation], and the plaintiff
proved no other personal losses").  However, courts have been reluctant to conclude that a
plaintiff lacks standing on this principle where "it is difficult to state with confidence where
plaintiff is asserting an injury to himself and where he asserts an injury to one of his business
entities. Laverty, 661 F. Supp. 2d at 62 (declining to conclude that plaintiff lacked standing and
denying motion to dismiss, but doing so "without prejudice to the renewal of the motion as to
additional specific aspects of plaintiff's claims once the record is more fully developed").

The fact that TDC is alleged to be an entity distinct from Silva is clearer here in light of
the allegations in the complaint than in Gianfresco v. Town of Wrentham, 712 F.3d 634, 638 (1st
Cir. 2013) ("bypass[ing] the shareholder-standing issue in favor of a more straightforward
resolution on the merits" where the ownership structure of the entity at issue was "unclear"),
upon which Plaintiffs rely.  However, it also appears that Silvia is alleging some injury to
himself as a result of the Defendants' actions.  See, e.g., D. 1-2 at ¶¶ 34, 38, 43, 48.  Although a

Court may bypass the analysis of the shareholder standing rule to reach the merits of the claims and does here given the scant record regarding the relationship between TDC, Silva and Whiplash, Gianfresco, 712 F.3d at 638 (noting that a court may by pass this "prudential component"), it may never bypass a question of "constitutional standing." Id. Here, however, Silva has at least asserted Article III constitutional standing because even if TDC is a separate corporate entity, "the Defendants' actions, although taken against his business rather than against [Silva] himself, caused him actual financial injury." Id.[2] Accordingly, to the extent that Defendants were seeking to dismiss Silva's claims on this basis, the Court declines to do so at this juncture, but such ruling is without prejudice to the Defendants' renewal of this motion on a more developed record.

### B.   Plaintiffs Have Not Met Its Burden to Prevail on Its Motion for a Preliminary Injunction

#### 1.   *Plaintiffs Have Not Demonstrated a Likelihood of Success on Either Its Equal Protection or First Amendment Claims*

"The sine qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  The Court finds no such likelihood as to either claim upon which TDC relies in its motion for a preliminary injunction.[3]

---

[2] The Court turns later in this Memorandum and Order to the merits of Plaintiffs' claims against Defendant Shastany, the only defendant who has filed a motion to dismiss.

[3] Although the Complaint asserts twelve counts against the Defendants in this matter, TDC's memorandum in support of its motion for a preliminary injunction discusses only two claims for which it claims a likelihood of success on the merits.  D. 8-1 at 5-10.

a.      Equal Protection

Before considering the substance of Plaintiffs' claims, the Court addresses the legal framework for considering them.  The parties suggest two different standards that may apply in this case.  Plaintiffs suggest that to prevail on an equal protection claim, they must demonstrate that:  "(1) they were treated differently than similarly situated corporations and (2) the differential treatment was the result of a gross abuse of power, invidious discrimination, or some fundamental procedural unfairness."  D. 8-1 at 6 (citing Quarterman v. City of Springfield, 716 F. Supp. 2d 16, 34 (D. Mass. 2009) (citing Pagán v. Calderon, 448 F.3d 16, 34 (1st Cir. 2005))). Defendants, meanwhile, argue that plaintiffs must show:  "(1) that the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  D. 13 at 13 (citing Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995) (citing Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectman, 878 F.2d 16, 21 (1st Cir. 1989))).  The First Circuit has acknowledged that its jurisprudence regarding the standard for equal protection claims "has evolved."  Pagán, 448 F.3d at 34 n. 9.  The Court recognized in Pagán that although earlier cases "intimate a less differing standard," id. (citing Yerardi's, 878 F.2d at 21), the standard that Plaintiffs propose is "the proper standard in all cases in which a plaintiff [as here] premises an equal protection claim on a discretionary decision denying a state or local benefit."  Id. Accordingly, it is this standard that the Court applies here.  The First Circuit has warned that under this standard, a "plaintiff who grounds an equal protection claim on the denial of [a discretionary] benefit faces a steep uphill climb" and that this standard amounts to a "high hurdle."  Id. at 34-35.

As to the first element of Plaintiffs' equal protection claim, to demonstrate that it was treated differently than similarly situated entities, they must identify and relate "specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression." Buchanan v. Maine, 469 F.3d 158, 178 (1st Cir. 2006) (emphasis in original) (citation omitted). Plaintiffs cite incidents at two other Stoughton venues that cater to the Town's Portuguese population. D. 8-6 ¶¶ 21-26.

On February 22, 2009, a shooting occurred outside the Portuguese National Club at 21 Railroad Avenue, Stoughton. Compl. ¶ 28; D. 8-6 ¶ 21. On January 12, 2013, a "brawl" occurred involving 200 people at Club Luis de Cameos at 76 Porter Street, Stoughton. Compl. ¶ 31; D. 8-6 ¶ 24. The Town did not revoke either establishment's entertainment license. Compl. ¶¶ 30, 33; D. 8-6 ¶ 23, 26.

Shastany also attests that the Stoughton Police investigated the two incidents at the Portuguese National Club and Club Luis de Cameos. Shastany reports that with regard to the February 22, 2009 incident, there were conflicting accounts of the incident and it is possible that the shots were fired from a moving vehicle totally unrelated to the Portuguese National Club. D. 13-1 ¶ 18. As for the altercation at the Club Luis de Cameos, Shastany determined that the altercation could not be attributed to the club's lack of control over its premises. Id.

Both instances were isolated. In other words, Plaintiffs point to only one incident at each venue where police involvement was required. See id. At Whiplash, however, the record demonstrates that police involvement was required consistently over the course of a year. D. 13-1 ¶ 9. The result of this continuing course of conduct was that Shastany "determined it was necessary to direct the entire shift of police officers on duty at closing time (1:00 A.M.) [to]

station themselves at Whiplash to facilitate peaceful dispersal of patrons" with the assistance of Randolph and Canton local police and the MSP.  Id. ¶ 11.  On this record, the Court cannot say that the "specific instances" Plaintiffs cite are "situated similarly in all relevant aspects." Buchanan, 469 F.3d at 178.   Accordingly, Plaintiffs have therefore failed to demonstrate likelihood of success on the first element of its equal protection claim.

Even assuming that the other Stoughton venues were similarly situated in all relevant aspects, the list of incidents at Whiplash over the last year that bear upon public safety weighs heavily against the Court finding that the Board's actions were a "gross abuse of power" or based upon racial animus.  "Gross abuse of power" equates to the "'shocks the conscience' concept used in substantive due process cases."  Pagán, 448 F.3d at 36 (citing Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000)).  In the equal protection context, a finding of "gross abuse of power" normally results from "personal malice" and actions taken in "bad faith."  Tapalian v. Tusion, 377 F.3d 1, 7 (1st Cir. 2004); Rabinovitz, 60 F.3d at 912 (finding "gross abuse of power" where public official has personal hostility directed at plaintiff, undertaking a "malicious orchestrated campaign causing substantial harm"); see also Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.3d 32, 45 (1st Cir. 1992) (noting that the First Circuit "ha[s] left the door slightly ajar for federal relief in truly horrendous situations").  Here, the Board in their deliberations discussed concerns for Stoughton's police officers, private citizens, neighborhood and escalation of activities at and around Whiplash.  See D. 13-2 at 72-78.  Similarly, Shastany discussed his fears for police safety as well as the general public concern surrounding Whiplash. Id. at 26.  Accordingly, the Court finds that Plaintiffs have not demonstrated a likelihood of success on the second element of its equal protection claim.

b.      First Amendment

The nature of Plaintiffs' First Amendment challenge is somewhat unclear.  Plaintiffs do not ask the Court to examine whether Defendants had substantial evidence to revoke TDC's entertainment license.  Cf. The Black Rose, Inc. v. City of Boston, 433 Mass. 501, 503-04 (2001) (determining that the "substantial evidence" test applies to certiorari claims seeking the reversal of administrative actions).  Plaintiffs appear to be arguing that, as applied by the Board, Mass. Gen. L. cc. 138 and 140, § 183A, was an unlawful prior restraint on speech, see D. 8-1 at 8, and that "the Defendants' application of the statute was unconstitutional in that it was a pretext to close down the Whiplash premises."  Id.  That is, the Court understands Plaintiffs to argue that the Defendants (1) deprived Plaintiff of its right to free expression by targeting a specific form of expression through a facially-neutral licensing scheme; and (2) used security concerns as a pretext for doing so.  Still, Plaintiffs do concede that "[r]egulations governing in advance the time, place or manner of expression permitted in a particular public forum are valid if they serve important state interests by the least restrictive means possible."  D. 8-1 at 8.

Here, Mass. Gen. L. c. 140, § 183A is content-neutral regarding its regulation of the entertainment licensing scheme and the same is true for the alcohol licensing scheme under c. 138 and, therefore, are not subject to "strict scrutiny" review that would apply if such provision "suppress[ed], disadvantage[d], or impose[d] differential burdens upon speech because of its content."  Asociación de Educación Privada de Puerto Rico, Inc. v. García–Padilla, 490 F.3d 1, 15–16 (1st Cir. 2007).  Under intermediate scrutiny, applicable to time, place and manner restrictions, the "government may impose reasonable restrictions on the time, place, or manner of protected speech provided the restrictions . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication."  Id. at

15–16.  Even under this standard, governmental entities may limit expression where they have a factual basis to conclude that security concerns outweigh First Amendment freedoms.  <u>See</u> <u>Bl(a)ck Tea Society v. City of Boston</u>, 378 F.3d 8, 14 (1st Cir. 2004) (affirming district court's denial of preliminary injunction based upon "quantum of 'threat' evidence" supporting conclusion that city should have leeway to limit political demonstrations to a specific area of the Democratic National Convention); <u>United for Peace & Justice v. City of N.Y.</u>, 243 F. Supp. 2d 19, 25 (S.D.N.Y. 2003) (denying preliminary injunction barring denial of permit to hold political demonstration where "police concerns about security threats posed for the United Nations are far from theoretical"), <u>aff'd,</u> 323 F.3d 175 (2d Cir. 2003).  In short, where municipalities limit the time, place or manner of speech based upon substantial security concerns, such restrictions are narrowly tailored to advance a significant governmental interest.

Here, the Town and its Selectmen acted in furtherance of a strong countervailing significant government interest in promoting public safety.  The deliberations of the Board show concern for the safety of Stoughton's police officers, <u>see</u> D. 13-2 at 73 (statement of Mr. Anzivino) the safety of the public, <u>see</u> <u>id.</u> at 79 (statement of Mr. Recupero) and for the neighborhood, <u>see</u> <u>id.</u> at 75 (statement of Ms. Walsh), as well as the escalation of activities at and around Whiplash, <u>see</u> <u>id.</u> at 74 (statement of Mr. Anzivino).  Indeed, Stoughton police responded to several incidents at Whiplash over the course of the ten months preceding and culminating in the two April 2013 incidents.  D 13-1 at 4-5.  This conduct escalated to the point where Chief Shastany reasonably believed that the only way to manage the continuing issues relative to the nightclub was to dispatch all officers on duty to Whiplash at closing time.  <u>Id.</u>  The Court acknowledges that Mr. Recupero did state that the "entertainment is a magnet . . . it's attracting a problem.  And in my mind I don't think this property is appropriate for this entertainment."  D.

13-2 at 76.  This may suggest some animus directed toward the type of entertainment that Whiplash sponsored.  However, viewing the record as a whole, Plaintiffs have not demonstrated that there is a substantial likelihood that it will prevail on this claim where there was a significant government interest supporting the Board's actions.

In addition, the Town's actions were no more restrictive than necessary and narrowly tailored to serve the significant interest in public safety.  The Town suspended Whiplash's liquor license for only 30 days, after which it was reinstated but limited until 11:00 p.m. D. 6 at 19. The Town revoked Whiplash's entertainment license "without prejudice," id., and noted in their deliberations that they would entertain a new application for a license in the future.  D. 13-2 at 79.  That is, TDC now has its liquor license back (albeit it is limited to service until 11 p.m.) and there is no bar to TDC re-applying for an entertainment license.  Accordingly, the Court finds that Plaintiffs will not likely establish that the Town's actions fail intermediate scrutiny.

### 2. *Plaintiffs Have Not Demonstrated That It Will Suffer Irreparable Harm Absent Preliminary Injunctive Relief*

Plaintiffs assert that absent a preliminary injunction it will be irreparably harmed because without its licenses, it cannot sustain sufficient revenue to remain in business.  This argument fails for at least three reasons.

First, in light of the Whiplash having served the thirty-day suspension of its liquor license, at least part of plaintiff's motion appears moot.  Guillemard-Ginorio v. Contreras Gomez, 161 Fed. App'x. 24, 27 (1st Cir. 2005) (finding that appeal of preliminary injunction restraining revocation of insurance license was moot where revocation had been reversed on appeal).  Relatedly, "[a] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted."  Fiba Leasing Co., Inc. v. Airdyne Indus., Inc., 826 F. Supp. 38, 39 (D. Mass. 1993) (citing San Francisco Real Estate v. Real Estate Invest.

Trust of America, 692 F.2d 814, 818 (1st Cir. 1982)).  Plaintiffs represented at oral argument that

Whiplash has decided not to open its doors despite being able to do so.  This further militates

against a finding of irreparable harm here.

Second, the harm identified by Plaintiffs is purely monetary.  Although the Court

recognizes that its present lack of an entertainment license will make it more difficult for

Whiplash to generate revenue (and the modification of the liquor license to service before 11

p.m. may limit the generation of revenue), mere financial loss is not irreparable harm.

Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (finding that

pecuniary harm resulting from loss of control of business is not irreparable harm); see also

Nedder v. Rivier Coll., 908 F. Supp. 66, 83 (D.N.H. 1995) (citation and internal quotation marks

omitted) (noting that "[i]t is well established that temporary loss of income, which can be

recouped at the end of a trial, does not usually constitute irreparable injury.  Therefore, the fact

that [plaintiff] is currently unemployed and unable to earn a living in her chosen profession does

not constitute irreparable harm").

Plaintiffs argue that "Whiplash is in imminent danger of foreclosure."  D. 8-1 at 11.

Even if the Court presumes that to be the case, there was no suggestion that Whiplash cannot

reopen with its current liquor license and/or re-apply for an entertainment license to generate

revenue and decrease the danger of foreclosure or that any risk of foreclosure of Whiplash

cannot be remedied by money damages.

Third, an injunction is not the only means to redress the harm that Plaintiffs suffer here.

Where there are "alternative means" to redress the "irreparable harm" alleged by a movant for

preliminary relief, this "undermines [the movant]'s argument that it is facing an intolerable risk

of irreparable harm."  Charlesbank, 370 F.3d at 163.  The Town's revocation of Whiplash's

entertainment license was "without prejudice to apply in the future." D. 8-7 at 5. The transcript of the hearing further suggests that it is entirely possible that TDC could reapply for an entertainment license in the future provided that Silva could "at some later date . . . go in the chief's office, speak with the chief, speak with the deputy chief, lay out for them a plan where you can have entertainment in that place and it can be done with regard to the safety of the patrons, the police officers, the neighbors, and the good function of the downtown area generally." D. 13-2 at 76-77. Accordingly, Plaintiffs have not demonstrated irreparable harm.

### 3.   *The Balance of Harms Weighs Heavily in the Town's Favor*

The balance of harms tips in favor of denying relief given that, as discussed above:  (1) it is not presently clear on this record that Whiplash is incapable of operation; (2) the Town offered to have Whiplash propose a plan for re-opening its doors with the benefit of an entertainment license; and (3) according to representations at oral argument, the review process is still in progress.  This is especially true where Defendants have identified legitimate public safety concerns.  See Phippsburg Shellfish Conservation Comm'n v. U.S. Army Corps of Engineers, 800 F. Supp. 2d 312, 327 (D. Me. 2011) (denying preliminary injunction based in part on safety concerns).

### 4.   *The Public Interest Favors Denial of Preliminary Relief*

As discussed above, conduct at Whiplash over the course of nine months necessitated unprecedented law enforcement resources and intervention.  D. 13-1 ¶ 9.  This fact alone demonstrates that the public interest is not served by injunctive relief, as preventing diversion of law enforcement resources is in the public interest.

The motion for a preliminary injunction is hereby DENIED.[4]

### C.   Plaintiffs Have Not Stated Claims Against Shastany Through Counts IV-VI Or Count XII

Shastany raises a number of arguments in support of his motion to dismiss. First, he alleges that his actions were not the direct and proximate cause of the Town's revocation of Whiplash's licenses. D. 10 at 9 (argument as to First Amendment claim); id. at 11-12 (argument as to public accommodation claim). Second, he argues that Plaintiffs have made insufficient factual allegations to state a claim on equal protection grounds. Id. at 10. Third, he argues that Plaintiffs have failed to state a claim against Shastany under the Massachusetts Civil Rights Act. Id. at 12-13. Fourth, he argues that there is no private right of action arising under either the Massachusetts Declaration of Rights or Mass. Gen. L. c. 138 or c. 140. Id. at 14. Fifth, he argues that he is entitled to qualified immunity. Id.

#### 1.   Plaintiffs Have Stated Federal Claims Against Shastany (Counts I-III)

Defendants argue that Plaintiffs cannot hold Shastany liable for the Town's actions under § 1983 claims. D. 10 at 9. "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999). Liability under section 1983 arises only if "a plaintiff can establish that his or her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization." Grajales v. Puerto Rico Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012) (citation and internal quotation marks omitted).

---

[4] In light of counsel for the Plaintiffs' representation at oral argument that the motion for expedited discovery, D. 8-2, was to aid the motion for a preliminary injunction, that motion is DENIED AS MOOT.

In examining causation, the First Circuit has considered the degree to which public officials were involved in decisions that allegedly result in constitutional deprivations. For example, in Welch v. Ciampa, 542 F.3d 927, 933 (1st Cir. 2008), a police officer asserted a § 1983 claim against a town police chief, former police chief, the town's board of selection and the town, asserting that he was not reappointed to the position of detective sergeant based upon an exercise of his First Amendment rights. Id. The First Circuit rejected the officer's claims against the selectmen and former police chief because "[the current police chief] alone had the authority to make the . . . appointments and there is no evidence that [the other defendants] had any involvement in his decision." Id. at 936-37.

Some other circuits are in accord with the principle that public officials who recommend actions alleged to be constitutional deprivations are not liable under § 1983. In Dixon v. Burke Cnty., Ga., 303 F.3d 1271, 1275 (11th Cir. 2002), for example, the Court found that a public official who recommended that a panel appoint a white male to the defendant-county's Board of Education was not liable under § 1983 because it was the panel that made the final decision and there was no suggestion that the defendant had "actually coerced" or "exercised extraordinary influence" over the decisionmakers such that they were "deprived of their individual freedom of rational thought." Id.; see also Brown v. Tull, No. 99-50442, 2000 WL 821404, at *4 (5th Cir. May 30, 2000) (unpublished) (finding public official not liable for recommendation of unlawful activity where she did not "personal[ly] participat[e]" in it); Johnson v. Louisiana, 369 F.3d 826, 831 (5th Cir. 2004) (finding that "[a]s to causation, only final decision-makers may be held liable for First Amendment retaliation employment discrimination under § 1983").

Some other circuits have, however, found that an "influential recommender can be liable under § 1983 without being the final decisionmaker, if the recommendations are shown to be

sufficiently influential." Ward v. Athens City Bd. of Educ., No. 97-5967, 1999 WL 623730, at *8 (6th Cir. Aug. 11, 1999) (unpublished); see also Warner v. Orange County Dep't of Probation, 115 F.3d 1068, 1072–73 (2d Cir. 1996) (concluding that probation department could be liable for recommendation to sentencing judge under § 1983); Balaban v. Lincoln Cnty. Ambulance Dist., No. 1268, 2007 WL 4205806, at *6 (E.D. Mo. Nov. 26, 2007) (noting that a "recommendation that leads to an adverse employment action may be sufficient to establish liability under § 1983") (citing Darnell v. Ford, 903 F.2d 556, 562 (8th Cir. 1990)); Barmore v. Aidala, 419 F. Supp. 2d 193, 200 (N.D.N.Y. 2005) (finding that school principal could be liable for recommending to superintendent that African-American student be suspended, where student alleged that recommendation was race-based).

The Court does not read Welch as restricting § 1983 liability to final decision-makers as a matter of law, particularly here, where it is alleged that Shastany had substantial influence on the final decision made by the Board.  The crux of the First Circuit's decision in Welch was that the former police chief and the two selectmen could not be liable because they had no involvement in the decision not to appoint the plaintiff and the final decisionmaking authority rested with the current police chief.  Welch, 542 F.3d at 937.  Moreover, the Court evaluated the potential liability of these individuals on a much fuller record than what is currently before the court.  Id. (affirming district court's grant of summary judgment).

Although the parties have not cited and the Court is unaware of a First Circuit case specifically addressing whether an "influential recommender" can be held liable under § 1983, cf. Tejada-Batista v. Morales, 424 F.3d 97, 102 & n. 3 (1st Cir. 2005) (noting that "a rigid rule would not comport with sound policy" regarding the issue of whether "a tainted adverse recommendation from a supervisor to a superior might create [Section 1983] liability even if the

superior's own motive was pure"), the Court agrees with those courts that have left open the possibility of liability for such individuals. Here, Plaintiffs have pled sufficient facts to show that Shastany's recommendation was "sufficiently influential" for the plausibility of Section 1983 to attach. Ward, 1999 WL 623730, at *8. It appears that the Board relied upon Shastany's informed judgment as the chief public safety officer for the municipality. He was responsible for initiating the petition to strip Whiplash of its licenses, D. 6 at 16-17, the primary witness at the Town's hearing on the matter, and the chief of the remaining witnesses, who were all Stoughton police officers. Id. at 24. Based upon this record, the Court cannot say that the facts pled in the complaint do not at least "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. Accordingly, the Court DENIES Shastany's motion to the extent it seeks dismissal of Counts I-III.

2.      *Plaintiffs Cannot State Claims against Shastany under the MCRA (Counts IV-VI)*

Shastany argues that there are both substantive and procedural bars to Plaintiffs' MCRA claims. As to the procedural bar, Shastany argues that Plaintiffs' MCRA claims are asserted against Shastany in his official capacity, which the MCRA does not permit. D. 10 at 12. It is true that "to avoid a State's sovereign immunity to a damages suit, a plaintiff must sue the State official in his individual and not his official capacity." O'Malley v. Worcester Cnty., 415 Mass. 132, 141 n.13 (1993). The complaint lists Shastany as a defendant "in his individual and official capacities." Compl. ¶ 10. As an initial matter, the Court agrees that Plaintiffs cannot bring Counts IV-VI against Shastany in his official capacity.

Shastany also argues that the MCRA claims against him in his individual capacity should be dismissed because there is no allegation that he acted through threats, intimidation or coercion. "To establish a claim under the [MCRA], the plaintiffs must prove that (1) their

21

exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Swanset Dev. Corp. v. City of Taunton, 423 Mass. 390, 395 (1996) (citation and internal quotation marks omitted) (citing Mass. Gen. L. c. 12, § 11I).  "'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474 (1994).  "Intimidation," meanwhile, "involves putting in fear for the purpose of compelling or deterring conduct." Id. Finally, "coercion" amounts to "the use of physical or moral force to compel [another] to act or assent." Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 565 (1995).  Moreover, the "threats, intimidation or coercion" requirement "was specifically intended to limit liability under the Act." Id. at 565-66.  "Adverse administrative action, at least when not part of a scheme of harassment, does not amount to threats, intimidation or coercion." Smith v. Town of Longmeadow, 29 Mass. App. Ct. 599, 603 (1990) (internal quotation marks omitted).

The complaint lacks any allegations or inferences that Shastany's actions were threatening, intimidating or coercive.  In fact, the only allegations that Plaintiffs make specific to Shastany are:  that Shastany sent a letter to the Board asking them to revoke Whiplash's entertainment license and suspend its liquor license; and that Shastany testified at the May 8, 2013 hearing regarding Whiplash's licenses.  Compl. ¶¶ 20-21, 26.  In this way, Shastany's conduct was directed towards the Board, urging them to act and was not aimed at Plaintiffs in any form.  Smith, 29 Mass. App. Ct. at 603.  Plaintiffs have therefore failed to state an MCRA claim against Shastany.  Accordingly, Counts IV-VI against Shastany are DISMISSED WITHOUT PREJUDICE.

3.      *Plaintiffs Cannot State Claims Under the Massachusetts Declaration of Rights (Counts VII-IX)*

Shastany argues that the Court should dismiss Counts VII-IX, which allege deprivations of rights guaranteed by the Massachusetts Declaration of Rights in the Massachusetts Constitution because there is no private right of action for violations of these rights.  D. 10 at 14. Instead, argues Shastany, plaintiffs must allege violations of these rights through the MCRA.  Id. It is generally accepted that the MCRA "occupies the field" under most circumstances, Martino v. Hogan, 37 Mass. App. Ct. 710, 720 (1994), rev. den., 419 Mass. 1106 (1995), leaving no other recourse for an individual to assert a state constitutional claim against a state actor.

The Massachusetts Supreme Judicial Court has noted in dicta that "a person whose constitutional rights have been interfered with may be entitled to judicial relief even in the absence of a statute providing a procedural vehicle for obtaining relief."  Phillips v. Youth Dev. Program, Inc., 390 Mass. 652, 657–58 (1983); see also Layne v. Superintendent, Mass. Corr. Inst., Cedar Junction, 406 Mass. 156, 159–60 (1989) (finding constitutional claim moot, but noting that "a State may not violate a person's constitutional rights and then fairly assert that no redress can be had because the State has not provided a statutory means of enforcing those rights"). In addition, "[a]t least one justice of the Superior Court has also indicated that claims brought directly under the Declaration of Rights should be permitted."  Parsons ex rel. Parsons v. Town of Tewksbury, No. 09-1595, 2010 WL 1544470, at *5 (Mass. Super. Jan. 19, 2010) (citing McClure v. East Brookfield, No. 97-2004, 1999 WL 1323628 *2 (Mass. Super. Mar. 11, 1999)). However, the dicta in Layne and those cases citing it clearly aim to address harms that have no statutory redress.  Here, the MCRA clearly provides a means to sue a state actor for racial discrimination, provided that the actor uses threats, intimidation or coercion.  See Grubba v. Bay State Abrasives, Div. of Dresser Indus., Inc., 803 F.2d 746, 748 (1st Cir. 1986) (noting that the

MCRA was "a fully adequate procedural vehicle" to redress constitutional deprivations).  The Court therefore DISMISSES Counts VII-IX against Shastany.[5]

> 4.   *There Is No Private Right of Action Under Mass. Gen. L. cc. 138, 140 (Counts X and XI)*

At oral argument, Shastany argued that there is no private right of action under Mass. Gen. L. c. 138 and c. 140.  The Court agrees.  As to the c. 138 claim, "each reported case dealing with the subject has rejected private efforts to coax a right of action out of some alleged violation of c. 138."  Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co., Inc., 56 Mass. App. Ct. 853, 857 n.8 (2002) and cases cited.  As to the c. 140 claim, "[j]udicial review of . . . a decision [revoking an entity's entertainment licenses] is only available in the nature of certiorari, pursuant to [Mass. Gen. L.] c. 249, § 4," which this is not.   Premier Club Enterprises, Inc. v. Lukes, No. 11-0530, 2011 WL 1366662, at *3 (Mass. Super. Mar. 25, 2011) (citing Black Rose, Inc., 433 Mass. at 503).  The Court therefore DISMISSES Counts X and XI against Shastany.

> 5.   *Plaintiffs Have Failed to Exhaust Administrative Remedies for Its Public Accommodation Claim (Count XII)*

Shastany also argues that Plaintiffs has failed to state a claim under Mass. Gen. L. c. 272, § 98 in that Plaintiffs have raised insufficient allegations "to form the basis for an allegation that Shastany denied the plaintiffs equal treatment in a place of public accommodation."  D. 10 at 12. "[A]ctions brought under the Public Accommodations Statute are subject to [Mass Gen. L. c.] 151B § 5's nonwaiveable requirement that a plaintiff file a complaint with the MCAD [Massachusetts Commission Against Discrimination] before filing a civil suit."  Griffiths v. Town of Hanover, No. 11-12115-JLT, 2012 WL 3637791, at *4 & n. 39 (D. Mass. Aug. 21,

---

[5] Shastany also raises the defense of qualified immunity.  However, because the defense often requires the development of a factual record, "[t]he matter of qualified immunity usually is decided on a motion for summary judgment."  Longval v. Comm'r of Correction, 448 Mass. 412, 418 n.10 (2007).  Accordingly, the Court declines to decide the issue of qualified immunity on this record.

2012) (citing East Chop Tennis Club v. Mass. Comm'n Against Discrimination, 364 Mass. 444, 446 (1973) (finding that the administrative exhaustion of Mass. Gen. L. c. 151B § 5 governs claims under Mass. Gen. L. c. 272, § 98)).  Plaintiffs have not alleged that that they have filed a complaint with the MCAD.  Accordingly, the Court DISMISSES WITHOUT PREJUDICE Count XII against Shastany.

## V.    Conclusion

For these reasons, the Court DENIES Plaintiffs' motions for a preliminary injunction and expedited discovery, D. 8; ALLOWS Shastany's motion to dismiss to the extent it seeks dismissal of Counts IV-XII, but DENIES Shastany's motion to the extent it seeks dismissal of Counts I-III, D. 9.  Accordingly, Counts VII-XI against Shastany are DISMISSED WITH PREJUDICE and Counts IV-VI and XII against Shastany are DISMISSED WITHOUT PREJUDICE.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge