# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| THE DO CORPORATION and<br>DANIEL SILVA,<br><br>              **Plaintiffs,**<br><br>    v.<br><br>TOWN OF STOUGHTON et al.,<br><br>              **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)      **Civil Action No. 13-11726-DJC**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                    **July 24, 2015**

## I.      Introduction

Plaintiffs The Do Corporation ("TDC") and its President, Daniel Silva (collectively "Plaintiffs"), filed this lawsuit against the Town of Stoughton (the "Town"); its Board of Selectmen, John M. Anzivino, Cynthia A. Walsh, Stephen G. Anastos,[1] Robert J. O'Regan and Thomas J. Recupero; its Police Chief, Paul J. Shastany; and Town Manager, Michael Hartman (collectively "Defendants").  D. 1-2.  Plaintiffs allege that Defendants deprived them of their rights to freedom of speech, freedom of association and equal protection of the law under the First and Fourteenth Amendments of the United States Constitution by revoking TDC's entertainment license and modifying its liquor license (Counts I-III).  Id. ¶¶ 35-49.  Plaintiffs

---

[1] The complaint incorrectly named Stephen G. Anastos ("Anastos") as "Stephen Anastasia."  D. 1-2.

also allege claims under various provisions of Massachusetts statutory law and the Massachusetts Declaration of Rights (Counts IV-XII).  Id. ¶¶ 50-88.  Defendants have moved for summary judgment.[2]  D. 59; D. 63.  For the reasons stated below, the Court ALLOWS the motions.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'"  Id. (quoting Anderson, 477 U.S. at 249) (alteration in original).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

Unless otherwise noted, the following facts are drawn from the undisputed facts

---

[2] The Court previously dismissed Plaintiffs' claims against Defendant Anastos, D. 54.

submitted by the parties, D. 61; D. 65; D. 71.

From late 2001 through May 8, 2013, TDC and its president, Daniel Silva ("Silva"), operated a nightclub, "Whiplash," which was located at 63 Wyman Street, Stoughton, Massachusetts.  D. 61 ¶ 1; D. 65 ¶ 1; D. 71 ¶ 1.  TDC and Silva held a liquor license and an entertainment license for Whiplash issued by the Stoughton Board of Selectmen ("Board"), pursuant to Mass. Gen. L. c. 138 and c. 140.  D. 61 ¶ 1.  From the time of its opening and for several years following, Whiplash offered entertainment in the form of live bands, rock music and "Top 40" music.  D. 61 ¶ 2; D. 71 ¶ 1.  In January 2012, Whiplash changed its entertainment format to provide primarily "hip-hop" music played by disc jockeys.  D. 61 ¶ 2; D. 71 ¶ 1.  The format change was made for financial reasons because the live entertainment "wasn't bringing in enough money . . . [disc jockeys] seemed to bring in more of a crowd" and because the "dance crowd," who came to hear the music "drank more liquor."  D. 61 ¶ 3 (quoting TDC Depo, D. 61-1 at 3-4).

After the club changed its format, a number of incidents occurred at Whiplash requiring police response, including:

- On July 1, 2012, the Boston Police Department's Gang Unit arrested a suspected gang member from Roxbury, pursuant to a warrant, as part of an investigation into the presence of gang members at Whiplash.

- On July 14, 2012, Stoughton police arrested a Whiplash patron for disorderly conduct and indecent assault and battery.  The patron, who was intoxicated, urinated in public and groped and harassed female patrons at the club.

- On September 16, 2012, Stoughton police arrested a patron of Whiplash for disturbing the peace.

- On October 29, 2012, there was a report and subsequent investigation of attempted arson with an accelerant at Whiplash.

- On November 11, 2012, Stoughton police issued a criminal summons to a juvenile from Randolph for assault and battery on three females, which took place outside the club after a "teen night" event.

- On March 24, 2013, Stoughton police arrested a Whiplash patron for intentionally running over the legs of another patron with a motor vehicle, putting the vehicle in reverse and accelerating into the victim, then stopping on the victim's legs. This patron was subsequently found to have outstanding warrants.

- On April 14, 2013, Stoughton officers responded to a fight inside the club, where a patron punched a Stoughton police sergeant and attempted to seize his firearm. As the club emptied, 200 to 300 patrons gathered, necessitating a request for mutual aid assistance from three other police departments, including the State Police.  Six individuals, all of whom were from Boston and one of whom was underage, were arrested in a parking lot adjacent to Whiplash.

- On April 20, 2013, Stoughton officers placed a heavily intoxicated club patron under protective custody to prevent him from driving home.

- On April 21, 2013, altercations took place inside the club, including one in which a patron assaulted a police officer. After the individuals involved in the first altercation were escorted out of the club, two rounds of gunshots were fired outside the club, striking two patrons, including a 16-year old.[3]

Id. ¶ 4a-j; see also D. 65 ¶¶ 89-90.  In the wake of some of these incidences, Stoughton Police Chief Paul J. Shastany ("Shastany") determined that the disturbances were due to the club's failure to provide adequate crowd control measures, particularly at closing time.  D. 61 ¶ 5. Attempting to address the issue, Shastany ordered the entire night shift of the Stoughton Police Department to be present at Whiplash at closing time (1 a.m.) on Fridays and Saturdays.  Id.

---

[3] Plaintiffs point to video surveillance recordings to suggest that there is a genuine dispute of fact as to whether any fights actually occurred inside Whiplash on April 14, 2013 and April 21, 2013.  D. 70 at 3-4 (citing Exhs. G & H, D. 70-7, 70-8).  The videos provided by Plaintiffs only show limited portions of the club interior on the nights in question.  In addition, the April 20, 2013 video, D. 70-8, only show the hours before and up to midnight, and therefore, do not create a genuine issue of material facts as to the events that occurred in the early hours of April 21, 2013.  Likewise, the April 14, 2013 video, D. 70-7, does appear to show a fight break out at approximately midnight with the club mostly clearing out over the next fifteen minutes, but does not show Whiplash's exits or exterior.  See D. 70-6 at 6-8.

Shastany further ordered the police dispatch to "hold" all non-emergency calls until the Whiplash patrons were dispersed.  Id.

After the incidents in April 2013, however, Shastany determined that police efforts had been unavailing and requested that the Board take action on Whiplash's entertainment and liquor licenses.  Id. ¶ 6.  Specifically, on April 23, 2013, Shastany wrote to the Board and the Town Manager, informing them of "disturbing and dangerous occurrences that are a threat to public safety at Whiplash."  D. 65 ¶¶ 2-3.  The letter provided, in part:

> This series of problems came upon us very quickly when Whiplash started to attract a younger urban clientele. We have been proactive, working as a partner with residents and businesses, to create stable safe environments they need to succeed. We routinely guide, educate, and work with businesses to identify and correct issues concerning public safety. It is one of our responsibilities and core functions to help businesses safely operate in our community. We have seen many positive results which please us.
>
> Despite all of our efforts, Whiplash continues to constitute a serious threat to the safety of the public, and Police Officers.

D. 61-14 at 2.  Shastany's letter specifically requested that the Board revoke Whiplash's entertainment license, suspend its alcohol license and modify the hours of operation and service of alcoholic beverages by imposing a closing time of 11:00 p.m.  Id. at 3.  The next day, on April 24, 2013, the Board sent Plaintiffs a Notice of Hearing concerning the Plaintiffs' alcoholic beverages license and entertainment license.  D. 65 ¶ 13.

On May 8, 2013, the Board held a hearing on Plaintiffs' alcohol and entertainment licenses.  Id. ¶ 14.  At the hearing, then-Sergeant John Bonney, Officer Matthew Farwell and Shastany told the Board about the various incidences occurring at Whiplash and expressed concern that the staff and/or management of the club did not have control over the patrons.  Id. ¶¶ 15, 17, 27, 31, 42, 46.  Executive Officer Devine told the Board that the Boston Police had informed Stoughton Police that several street gangs from Bowdoin Street and Harbor Point have

been frequenting Whiplash on a regular basis.  Id. ¶ 68.  Silva also spoke at the hearing, explaining that he rented Whiplash to disc jockeys, who then scheduled the events, and that a disc jockey had been subbing out to other disc jockeys, who seemed to be the ones that were "bringing all the trouble in."  D. 65-4 at 46; D. 65 ¶ 64.  Silva told the Board that he would not allow that particular disc jockey to return to the club, D. 65 ¶ 65, but acknowledged that the disc jockeys for the events supplied and paid for the security at Whiplash.  Id. ¶ 86.

Following the hearing, the Board made the following findings:  "(1) Whiplash unreasonably and unacceptably monopolized the resources of the Stoughton Police Department to ensure the safety of the patrons and public and also required unreasonable expenditure of resources of state and neighboring police departments; (2) Whiplash unacceptably placed at risk officers, neighbors, patrons, personnel and property; (3) Whiplash had not shown an ability to control or manage the crowd."  Id. ¶ 71.  Ultimately, the Board voted to revoke Whiplash's entertainment license, without prejudice to re-application, suspend its alcohol license for 30 days, and modify its closing time upon reinstatement to 11 p.m.  D. 61 ¶ 9.  On May 23, 2013, the Board provided Plaintiffs with a written Notice of Decision explaining the Board's findings and decisions.  D. 65 ¶ 76.  Since that time Plaintiffs have taken no action with the Board to reinstate their entertainment licenses or modify their closing time.  Id. ¶¶ 77-79.

## IV.    Procedural History

Plaintiffs instituted this action in Norfolk Superior Court on July 12, 2013.  D. 6. Defendants removed this action on July 17, 2013.  D. 1.  On July 31, 2013, Plaintiffs moved for a preliminary injunction, D. 8, and for expedited discovery.  D. 8-2.  Defendant Shastany subsequently moved to dismiss the claims against him.  D. 9.  On December 6, 2013, the Court denied Plaintiffs' motions for a preliminary injunction and expedited discovery and allowed in

part and denied in part Shastany's motion to dismiss.  D. 26.  Defendants Anastos and Michael

Hartman ("Hartman") moved for judgment on the pleadings on April 22, 2014.  D. 45.  The

Court entered judgment for Anastos and allowed in part and denied in part Hartman's motion.

D. 54.  Shastany subsequently moved for summary judgment.  D. 59.  The other remaining

Defendants have also moved for summary judgment.[4]  D. 63.  The Court heard the parties on the

pending motions on June 23, 2015 and took these matters under advisement.  D. 78.

## V.     Discussion

### A.     First Amendment Claims (Counts I and II)

Plaintiffs argue that "there is ample evidence from which a reasonable jury could infer

that the Defendants acted with malice and with the intentions of infringing on the constitutional

rights of the Plaintiffs," "conspir[ing] to prohibit Whiplash from presenting a particular genre of

music," D. 70 at 13, and infringing "Plaintiffs' freedom to associate for the purpose of engaging

and enjoying a specific form of art and expression," id. at 15.  As such, Plaintiffs contend that

Defendants (1) deprived Plaintiffs of their rights to free expression (i.e. hip-hop music) and

association (i.e., African American and Hispanic individuals enjoying hip-hop music) through a

facially-neutral licensing scheme; and (2) used security concerns as a pretext for doing so.  See

---

[4] After the hearing, Plaintiffs moved pursuant to Fed. R. Civ. P. 15(d) to supplement their opposition to summary judgment, notifying the Court that, on July 1, 2015, the Alcoholic Beverage Control Commission ("ABCC") decided "that the Defendants were not justified in suspending or modifying the Plaintiffs' Alcoholic Beverage license."  D. 80 at 2.  Although Defendants are correct that "[P]laintiffs' burden in this matter is not to prove that their operation of the Whiplash nightclub complied with licensing laws, but, rather, that the defendants' actions with respect to [P]laintiffs' licenses was motivated by either racial animus (Equal Protection claim) or a dislike for any protected speech or conduct in which the [P]laintiffs may have engaged (First Amendment claim), D. 81 at 1, the Court nevertheless GRANTS the motion, D. 80, and has reviewed the filing in connection with Defendants' motions for summary judgment, D. 59, 63.  As discussed further in this order, however, the ABCC's ruling in the Plaintiffs' favor in regard to the Board's actions does not answer the issue regarding the absence of a genuine issue of material fact as to the Plaintiffs' constitutional claims or the record before this Court.

Do Corp. v. Town of Stoughton, No. 13-cv-11726-DJC, 2013 WL 6383035, at *7 (D. Mass. Dec. 6, 2013).

> 1.   *Freedom of Speech Claim (Count I)*

To begin, Plaintiffs argue that Defendants used the licensing procedures under Mass. Gen. L. c. 138, § 12 (providing for suspension or revocation of a liquor license) and Mass. Gen. L. c. 140, § 183A (providing for suspension or revocation of an entertainment license) as a pretext to target allegedly protected expression.  See D. 70 at 12-14.  The licensing statutes at issue here, Mass. Gen. L. cc. 138, § 12, and 140, § 183A, are content-neutral and therefore are not subject to "strict scrutiny" review, which would apply to "regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content . . . ." Asociación de Educación Privada de Puerto Rico, Inc. v. García–Padilla, 490 F.3d 1, 15-16 (1st Cir. 2007).   Instead, "intermediate scrutiny" review applies.   Id. (noting that "regulations intended to serve purposes unrelated to content of the regulated speech, despite their incidental effects on speech, expression, or message are subject to intermediate scrutiny").

Under "intermediate scrutiny," the "government may impose reasonable restrictions on the time, place, or manner of protected speech provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication."  Id. (quoting Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton, 536 U.S. 150, 175 (2002)) (internal quotation marks omitted).   "A regulation is narrowly tailored if the means chosen are not substantially broader than necessary to achieve the government's interest."  Bl(a)ck Tea Society v. City Of Boston, 378 F.3d 8, 12 (1st Cir. 2004) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989)) (internal quotation marks

omitted).   Still, regulations "need not be the least restrictive or least intrusive means" of promoting the government interest.   Ward, 491 U.S. at 798.   And governmental entities may limit the time, place and manner of First Amendment-protected expression where they have a factual basis to conclude that security concerns outweigh such expression.   See, e.g., Bl(a)ck Tea Society, 378 F.3d at 14 (affirming district court's denial of preliminary injunction to modify a designated demonstration zone at the Democratic National Convention based upon "quantum of 'threat' evidence"); Do Corp., 2013 WL 6383035, at *7 (noting that "where municipalities limit the time, place or manner of speech based upon substantial security concerns, such restrictions are narrowly tailored to advance a significant governmental interest").

Here, the record demonstrates that the Defendants' actions were based on legitimate security concerns.   Namely, the record shows evidence of escalating crime – including violent crime – that was occurring in and around the club in the ten-month period before Shastany requested that the Board take action on Whiplash's licenses.   D. 61 ¶ 4(a)-(j).   Moreover, as noted above, due to the repeated incidents occurring at Whiplash, Shastany had deemed it necessary to order the entire night shift of the Stoughton Police Department to the club at closing time and had further ordered police dispatch to hold all non-emergency calls until the Whiplash patrons had been successfully dispersed.   Id. ¶ 5.   Despite these efforts by the Stoughton police, however, violent incidences continued to occur in and around the club, including the April 21, 2013 double-shooting involving a sixteen-year old victim, which finally prompted Shastany to request that the Board take action on Whiplash's licenses.   Id. ¶ 6.   At the hearing, police officers then informed the Board about the regular and escalating incidents at Whiplash, including a patron grabbing an officer's gun and trying to pull it out of its holster, patrons striking police and

each other, large crowds fighting inside and outside the club, patrons refusing to disburse and, most notably, the double shooting.  See, e.g., D. 65 ¶¶ 15, 17, 27, 31, 42, 46.

Plaintiffs' counsel argued vigorously at the motion hearing that the Board's decision was not content neutral, but was focused on the nature of the expression (namely, the hip-hop music played at the club for the patrons of Whiplash).  The record belies this contention.  Focus was on the incidences of violence and the need for police intervention at Whiplash on a number of separate occasions in a short period of time.  Moreover, any reference to the nature of the entertainment by Shastany, the other police officers or the Board regarding the music, see id. ¶ 68, was not dissimilar to Silva's acknowledgment that he believed "a certain DJ" was "bringing all the trouble in."  D. 65-4 at 46.

Further, the Board's actions were narrowly tailored to serve the government's significant interest in public safety.  The fact that the Board was later found by the ABCC to have incorrectly applied the alcohol licensing regulations is not dispositive on any constitutional claims, which were not at issue before the agency.  The Court notes, for example, that revocation of Plaintiffs' entertainment license – the basis for the hip-hop music played at the club – was not considered by the ABCC at all.  Relevant here, a time, place or manner regulation "will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."  Ward, 491 U.S. at 800.  Although the ABCC ultimately found that the Board should have applied the liquor licensing regulation differently, at the hearing the Board focused on the security concerns and considered the most effective solutions to the problem.  See Coal. to Protest Democratic Nat. Convention v. City of Boston, 327 F. Supp. 2d 61, 70 (D. Mass. 2004) (noting that "the essence of narrow tailoring is that the regulation must focus[ ] on the source of the evils the [government] seeks to eliminate").  Even

after being presented with evidence of escalating violence in and around the club, the Board did not suspended Whiplash's liquor license indefinitely or revoke the club's entertainment license irreversibly.  Rather, Whiplash's liquor license was suspended for 30 days with reinstatement of the license subject to a closing time of 11 p.m. and revocation of the club's entertainment license was "without prejudice" to re-application.  D. 61 ¶ 9.  Notably, because Whiplash was only open Friday and Saturday nights, the 30-day suspension functionally amounted to an eight-night suspension.  In addition, the 11:00 p.m. closing was narrowly tailored to address the government interest as most of the violence motivating the Board action was occurring around 1:00 a.m. as the club shutdown for the night.

At the motion hearing, Plaintiffs' counsel argued that these restrictions were not narrowly tailored, but were designed to put the club out of business, and that the revocation of the entertainment license was aimed at suppressing a particular form of expression (i.e., hip-hop). Plaintiffs' counsel noted that, although Shastany had already indicated he was opposed to the entertainment provided at the club, the Board made reinstatement of the entertainment license contingent on Silva presenting a security plan to the Stoughton Police Department.  There is no evidence in the record to suggest that this step would be futile as no security plan was ever presented.   In sum, none of these restrictions required the club to change the type of entertainment it offered or to stop doing business entirely.

Accordingly, the Court concludes that there is no genuine issue of material facts as to Plaintiffs' freedom of speech claim and it fails as Defendants' actions were narrowly tailored to serve the significant governmental interest in public safety.

> 2. *Freedom of Association Claim (Count II)*

Plaintiffs' freedom of association claim likewise fails because Defendants' actions were no more restrictive than necessary and were narrowly tailored in furtherance of a significant government interest in public safety.   Moreover, "[t]he constitutionally protected right of association . . . has never been expanded to include purely social gatherings." URI Student Senate v. Town Of Narragansett, 631 F.3d 1, 12 (1st Cir. 2011).   "Rather, it is contingent on the presence of underlying individual rights of expression protected by the First Amendment." Id. The Supreme Court has identified two categories of "freedom of association" that justify constitutional protection:    "choices to enter into and maintain certain intimate human relationships" and association "for the purpose of engaging in those activities protected by the First Amendment." Id. (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984)).   "These categories cannot be stretched to form a generic right to mix and mingle." Id. (citing City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989)).   Here, Plaintiffs have not established a genuine issue of material fact that Whiplash served as more than a place for people to gather to drink, dance and socialize and, therefore, Plaintiffs have not demonstrated that they were engaged in protected "associational" activity.   Indeed, Plaintiffs admittedly began to offer hip-hop music at the club for purely economic reasons, as the live entertainment "wasn't bringing in enough money" and the "dance crowd" "drank more liquor."   D. 61 ¶ 3 (quoting TDC Depo, D. 61-1 at 3-4). Accordingly, the Court concludes that Plaintiffs' freedom of association claim fails.

**B.      Equal Protection Claim (Count III)**

To prevail on an equal protection claim where "applicable state law vests the decisionmaker with discretionary authority to award or withhold a state benefit," plaintiffs must demonstrate that:  (i) they were treated differently than similarly situated corporations and (ii) the differential treatment was the result of a gross abuse of power, invidious discrimination, or some

fundamental procedural unfairness.  <u>Pagán v. Calderón</u>, 448 F.3d 16, 34 (1st Cir. 2005).  The First Circuit has explained that this standard amounts to a "high hurdle," and a "plaintiff who grounds an equal protection claim on the denial of [a discretionary] benefit faces a steep uphill climb."  <u>Id.</u> at 34-35.

To satisfy the first prong, Plaintiffs must show that Whiplash was treated differently than similarly situated entities.  To do so, Plaintiffs must point to "<u>specific instances</u> where persons <u>situated similarly in all relevant aspects</u> were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression."  <u>Buchanan v. Maine</u>, 469 F.3d 158, 178 (1st Cir. 2006) (alteration and omission in original) (emphasis in original) (citation omitted) (internal quotation mark omitted).  Here, Plaintiffs argue that "the call logs for the Stoughton Police Department show that between January 1, 2013 and April 21, 2013, Stoughton police officers responded to Whiplash at closing less often than to other liquor licensed establishments."  D. 70 at 6.  Specifically, Plaintiffs argue that while police officers responded to Whiplash a total of twenty-four times during that period, they responded more often to at least three other establishments that have licenses to sell alcohol, but that provide entertainment to and serve primarily Caucasian patrons – Alex's of Stoughton (responded twenty-five times), the Last Shot (responded twenty-nine times) and Smokey Bones Restaurant (responded sixty-three times).  <u>Id.</u> at 6, 12.   Plaintiffs also rely on a series of incidents at Governor's Pub to show that they were treated differently than other similarly situated entities.  <u>Id.</u> at 6.  Specifically, Plaintiffs point to a March 1, 2012 assault that occurred inside the pub, a May 18, 2012 threat made by a patron while at the pub, a July 21, 2012 attempted fight inside the pub and January 24, 2014 and March 29, 2014 fights at the pub.  <u>Id.</u>

As an initial matter, Defendant Shastany argues that the incidents relied on by Plaintiffs should be stricken from the summary judgment record because Plaintiffs failed to raise these facts in response to discovery requests.[5]   D. 74 at 3 (citing Fed. R. Civ. P. 37(c)(1)). Nevertheless, even if the Court considers the instances relied on by Plaintiffs, the record does not show that these businesses were similarly situated to Plaintiffs in all relevant aspects.  To begin, the police logs show that the majority of "responses" noted by Plaintiffs were not calls for disturbances and do not clearly indicate that any illegal or violent activity was occurring.   See Police Logs, D. 70-10-70-12.  In fact, the police logs show that officers where "out for closing;" performing a "patrol check," a "business check" or a "compliance check;" were conducting motor vehicle stops; checking on building alarms and were "investigating" lost credit cards and cell phones.   See D. 74 at 4; see also, D. 70-10-70-12.   Further, the "fights" relied on by Plaintiffs occurred less frequently than the incidences at Whiplash.  D. 74 at 5-6 (citing D. 70-13-70-14) (noting that the six incidents at Alex's of Stoughton and Smokey Bones Restaurant, respectively, and the five incidents at Governor's Pub spanned over two years while police responded to 10 incidents in a span of nine months at Whiplash).  And considering that these other businesses were open several nights a week, see D. 74-1 at 3, while Whiplash was open only two nights a week, the frequency of these events was even less similar.  Nor is there any evidence in the record that any of the other instances involved weapons or resulted in shootings, while the undisputed evidence demonstrates that there were numerous and escalating violent incidences in and around Whiplash.

---

[5] Previously, Plaintiffs had relied on incidents at two other Stoughton venues – the Portuguese National Club and Club Luis de Cameos – as the basis for their equal protection claim.  See Do Corp., 2013 WL 6383035, at *5-6.  They no longer cite these venues or incidents.

In sum, Plaintiffs' point the Court to over one hundred pages of police logs, but they have not rebutted with specific, admissible evidence Defendants' showing that there is no genuine issue of material fact that other establishments were not similarly situated to Plaintiffs in all material respects.  Having found no genuine issue of material fact as to whether the other establishments or incidents were similarly situated to Plaintiffs – either by establishment or by incidents – the Court need not reach the issue of whether any differential treatment was the result of a gross abuse of power or invidious discrimination, which is largely based on statements made by Defendant Shastany that the problems started when Whiplash started attracting a "younger urban clientele" and the "urban hip-hop" "type of client," D. 70 at 2, 5.

Accordingly, the Court concludes that there is no genuine issue of material fact as to Plaintiffs' equal protection claim.[6]

### C.     <u>Plaintiffs' Remaining Claims</u>

In Plaintiffs' opposition to the summary judgment motion, they oppose only the First Amendment and Equal Protection grounds.  Accordingly, the Plaintiffs have abandoned their other claims, <u>see</u> Draft Hearing Transcript, Tr. 14:7-10, and the Court need not address them here.

### VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motions for summary judgment, D. 59; D. 63.

**So Ordered.**

---

[6] The Court need not address Defendants' immunity defenses, D. 60 at 15-16; D. 64 at 17-20, given the Court's conclusion as to Plaintiffs' section 1983 claims.  <u>Morrissey v. Town of Agawam</u>, 883 F. Supp. 2d 300, 308 (D. Mass. 2012) (noting that "if a plaintiff fails to establish a constitutional violation, the court need not decide whether the defendant would nonetheless be entitled to qualified immunity").

/s/ Denise J. Casper
United States District Judge